1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANIMAL LEGAL DEFENSE FUND,

      Plaintiff,

  v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION,

      Defendant.

_____/

No. C -12-04376 EDL

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
CROSS-MOTION FOR SUMMARY
JUDGMENT**

      The parties filed cross-motions for summary judgment in this suit brought under the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 522, et seq. On August 13, 2013, the Court held a hearing

on the parties' motions. For the reasons stated at the hearing and in this Order, both motions are

granted in part and denied in part.

**Facts**[1]

      On December 19, 2011, the Division of Freedom of Information, Office of the Executive

Secretariat, United States Food and Drug Administration ("FDA") received a FOIA request from

Plaintiff seeking records concerning egg production farms in Texas. Sadler Decl. Ex. A; Kaelin

Decl. ¶¶ 7, 8. In particular, Plaintiff sought the following documents:

      1.    All FDA documents since April 26, 2011 relating to egg safety in Texas, egg
           production in Texas, or egg production facilities in Texas;

---

[1]      Both parties have filed objections to evidence filed with the motions. As stated at the
hearing, all of the objections are overruled. At the hearing, Defendant also for the first time argued that
the Court should strike the Bassett declaration, which was filed with Plaintiff's reply brief, as untimely.
Defendant did not object to the Bassett declaration as being improperly submitted with the reply.
Defendant's new argument comes too late. Also, Local Rule 7-3(c) states in relevant part: "Any reply
to an opposition may include affidavits or declarations, as well as a supplemental brief or memorandum
under Civil L.R. 7-4." The Court need not reach Plaintiff's request to conduct discovery pursuant to
Federal Rule of Civil Procedure 56(d) because the Court did not exclude evidence on summary
judgment.

United States District Court
For the Northern District of California

2.     All FDA communications between FDA and Texas state government agencies since April 26, 2011 relating to egg safety, egg production or egg production facilities;

3.     All FDA communications between FDA and egg producers in Texas since April 26, 2011.

Sadler Decl. ¶ 8; Ex. A.  Plaintiff's FOIA request was forwarded to the Dallas District Office, which handles information requests regarding FDA's activities in Texas, Arkansas and Oklahoma.  Sadler Decl. ¶ 10; Kaelin Decl. ¶¶ 1, 7.

     The staff in the Dallas office searched for all potentially responsive records in all of the locations where such information was reasonably likely to exist, including two FDA databases and the Dallas District Office file room.  Kaelin Decl. ¶ 9.  The staff first searched the Online Reporting Analysis Decision Support System ("ORADSS"), a data system that generates reports by compiling data about firms, inspections, and other regulatory activities from FDA's Field Accomplishment and Compliance Tracking System ("FACTS") according to user-provided criteria such as time frame, location or commodity.  Kaelin Decl. ¶ 9.  The staff searched for responsive records in FACTS for information about the firms identified in the ORADSS reports as possibly having responsive information.  Id.  Then, the staff searched the Dallas District Office's file room for records associated with the records identified by ORADSS and FACTS as potentially responsive.  Id.  The staff searched the ORADSS and FACTS databases and the file room broadly for any records relating to egg production facilities and egg safety in Texas since April 26, 2011, and did not confine the search to facilities dealing only with chicken egg production.  Id.

     The Dallas office's search revealed numerous records regarding egg production facilities and egg safety, including Lists of Establishment Inspection Reports ("EIRs"), which are investigators' narrative reports of their inspection findings at FDA-regulated facilities; Inspectional Observations, which are issued to firms at the close of inspections when violations are observed; correspondence between FDA and facilities; and results from salmonella enteritidis sampling conducted at the facilities.  Kaelin Decl. ¶ 10.  The search found records regarding chicken egg producers, quail egg producers, food manufacturers, food warehouses and food distribution centers.  Id.  The search did not reveal any communications since April 26, 2011 between the FDA and Texas state government

agencies that pertained to item two of the FOIA request.  Id.

After identifying the responsive records, the Dallas District Office conducted a line-by-line review of each record to determine whether any information was exempt from disclosure under the FOIA and to ascertain what information was reasonably segregable from exempt information. Kaelin Decl. ¶ 12.  Virtually all of the redactions of the responsive information were made pursuant to exemption 4, which exempts confidential commercial information from public disclosure.  Id. Among the information that was redacted was the information at issue in this case:

    (1) total hen population;

    (2) number of hen houses;

    (3) number of floors per house;

    (4) number of cage rows per house;

    (5) number of cage tiers per house; and

    (6) the number of birds per cage.

Id.

After reviewing and redacting the records, the office released 357 pages of responsive records to Plaintiff on March 2, 2012.  Sadler Decl. ¶ 11; Kaelin Decl. ¶ 14.  The responsive records related to inspections of the following facilities: eleven chicken egg production facilities; one quail egg production facility and food manufacturer; one food warehouse; and one food distribution center.  Kaelin Decl. ¶ 14.  The records included twelve EIRs from the same number of Texas egg production facilities; Inspectional Observations issued to nine of the twelve facilities; correspondence between the FDA and the twelve facilities; and the results from salmonella enteritidis sampling conducted at two of the twelve facilities.  Kaelin Decl. ¶ 14.  Of the twelve egg production facilities to which the FDA issued EIRs, seven were owned by Cal-Maine Foods, two were owned by Feather Crest Farms, one was owned by Mahard Egg Farm, one was owned by Kieke Egg Farm and one was owned by Ruby's Quail Farm.  Id.

By letter dated March 30, 2012, Plaintiff appealed the FDA's redactions.  Sadler Decl. ¶ 12; Ex. B.  The United States Department of Health and Human Services' Program Support Center ("PSC") acknowledged Plaintiff's appeal by letter on April 6, 2012.  Sadler Decl. ¶ 12; Ex. C.  PSC

United States District Court
For the Northern District of California

1  was still processing the appeal when Plaintiff filed this lawsuit, so the PSC subsequently sent a letter

2  to Plaintiff stating that in light of the action against the FDA, the appeal was being closed.  Sadler

3  Decl. ¶¶ 13, 14; Ex. D.

4        On September 25, 2012, the Dallas District Office became aware of one additional EIR from

5  a July 2011 inspection at an egg production facility that was owned at the time by Pilgrim's Pride

6  Corporation that had inadvertently not produced to Plaintiff.  Kaelin Decl. ¶ 15.  Kaelin personally

7  redacted the EIR, along with an Inspectional Observation form and correspondence between the

8  FDA and the facility.  Id.  The records totaled 41 pages, and were produced on October 1, 2012.

9  Sadler Decl. ¶ 11; Kaelin Decl. ¶ 15.

10        The Dallas District Office produced a total of 398 pages of records to Plaintiff responsive to

11  items one and three of the FOIA request, and there were redactions on 277 pages produced.  Kaelin

12  Decl. ¶ 16.  The Dallas office did not have any documents responsive to item two on the FOIA

13  request.  Kaelin Decl. ¶ 10.

14  **Legal standards**

15        "Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved."

16  National Resources Defense Council v. U.S. Dep't of Defense, 388 F.Supp.2d 1086, 1094

17  (C.D.Cal.2005) (quoting Mace v. EEOC, 37 F.Supp.2d 1144, 1146 (E.D. Mo.1999)) (internal

18  quotations omitted).  The underlying facts and possible inferences are construed in favor of the

19  FOIA requester.  National Resources Defense Council, 388 F.Supp.2d at 1095 (citing Weisberg v.

20  U.S. Dept' of Justice, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).  Because the facts are rarely in dispute

21  in a FOIA case, the court need not ask whether there is a genuine issue of material fact.  Minier v.

22  Central Intelligence Agency, 88 F.3d 796, 800 (9th Cir.1996).  The standard for summary judgment

23  in a FOIA case generally requires a two-stage inquiry.

24        First, the Court must determine whether the agency has met its burden of proving that it fully

25  discharged its obligations under FOIA.  Zemansky v. EPA, 767 F.2d 569, 571 (9th Cir. 1985) (citing

26  Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1350-1351 (D.C.Cir.1983)). The agency can

27  establish this by demonstrating that it has conducted a search that was reasonably calculated to

28  uncover all relevant documents.  Id. Here, Plaintiff does not dispute that the agency has fully

United States District Court
For the Northern District of California

1   discharged its search obligations under FOIA (see Pl.'s Reply to Def.'s Opp. to Mot. for Disc. at 6),

2   and the Kaelin declaration demonstrates that the agency conducted a search that was reasonably

3   calculated to uncover all relevant documents.

4        Second, the Court must examine whether the agency has proven that the information that it

5   withheld falls within one of the nine FOIA exemptions.  5 U.S.C. § 552(a)(4)(B); U.S. Dep't of State

6   v. Ray, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) ("The burden remains with the

7   agency when it seeks to justify the redaction of identifying information in a particular document as

8   well as when it seeks to withhold an entire document."); Dobronski v. FCC, 17 F.3d 275, 277 (9th

9   Cir. 1994).  The issue in this case is whether Defendant properly withheld the redacted information

10  pursuant to exemption 4.

11  **Discussion**

12       FOIA's "core purpose" is to inform citizens about "what their government is up to."  Dep't of

13  Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773, 775 (1989) (citation

14  omitted).  This purpose is accomplished by "permit[ting] access to official information long shielded

15  unnecessarily from public view and attempt[ing] to create a judicially enforceable public right to

16  secure such information from possibly unwilling official hands."  EPA v. Mink, 410 U.S. 73, 80

17  (1973).  Such access will "ensure an informed citizenry, vital to the functioning of a democratic

18  society, needed to check against corruption and to hold the governors accountable to the governed."

19  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).

20       At the same time, FOIA contemplates that some information can legitimately be kept from

21  the public through the invocation of nine exemptions to disclosure.  See 5 U.S.C. § 552(b)(1)–(9).

22  Use of the exemptions is within the agency's discretion, see Chrysler Corp. v. Brown, 441 U.S. 281,

23  293 (1979); "'exclusive,'" Milner, 131 S.Ct. at 1262 (quoting Mink, 410 U.S. at 79, 93 S.Ct. 827)

24  i.e., information not falling within the scope of an exemption must be disclosed; and "'narrowly

25  construed.'"  Id. (quoting FBI v. Abramson, 456 U.S. 615, 630 (1982)).  "These limited exemptions

26  do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."

27  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7–8 (2001) (citation omitted).

28  When an agency chooses to invoke an exemption to shield information from disclosure, it bears the

burden of proving the applicability of the exemption.  See Reporters Comm., 489 U.S. at 755.  An

agency may withhold only that information to which the exemption applies, and must provide all

"reasonably segregable" portions of that record to the requester.  5 U.S.C. § 552(b); see Mead Data

Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir.1977).

Defendant withheld the redacted information at issue here as confidential based on FOIA

Exemption number 4 for "trade secrets and commercial or financial information obtained from a

person and privileged or confidential." 5 U.S.C. § 552(b)(4).  Commercial information is

confidential if:

> disclosure of the information is likely to have either of the following effects: (1)
> impair the Government's ability to obtain necessary information in the future; or (2)
> to cause substantial harm to the competitive position of the person from whom the
> information was obtained.

GC Micro Corp. v. Defense Logistics Agency, 33 F.3d 1109, 1112 (9th Cir. 1994).  The second

component is at issue in this case.  See Def.'s MSJ at 12, n.7.  Under this standard, the government

need not show that release of the information would cause actual competitive harm, only that there

is: (1) actual competition in the relevant market; and (2) a likelihood of substantial competitive

injury if the information were released.  Id. at 1115.

To show that exemption 4 covers the redacted information, Defendant has filed numerous

declarations.  See Lawyers' Committee for Civil Rights of San Francisco Bay Area v. U.S. Dept. of

the Treasury, 534 F.Supp.2d 1126, 1137 (N.D. Cal. 2008) ("The court may award summary

judgment solely on the basis of information provided by the agency in affidavits or declarations

when the affidavits or declarations describe *the documents and the justifications for nondisclosure*

*with reasonably specific detail, demonstrate that the information withheld logically falls within the*

*claimed exemption, and are not controverted by either contrary evidence in the record nor by*

*evidence of agency bad faith.'*  Agency affidavits or declarations must be 'relatively detailed and

non-conclusory.'  Such affidavits or declarations are accorded 'a presumption of good faith, which

cannot be rebutted by purely speculative claims about the existence and discoverability of other

documents.'") (emphasis added).  The declarations address three types of competitive harm from

public disclosure: (1) facilitating underbidding of the egg producers at issue by other egg producers;

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  (2) disrupting farm sales; and (3) permitting competitors to emulate and improve upon the

2  production processes of the egg producers at issue.  Because Defendant has shown a likelihood of

3  substantial competitive harm due to underbidding for at least some of the redacted information, the

4  Court need not reach the other two bases.

5  **1.      There is actual competition in the relevant market**

6         There is no dispute that there is actual (indeed robust) competition in the relevant market.

7  See G.C. Micro, 33 F.3d at 1115 (stating that application of exemption 4 requires, among other

8  things, a showing that there is actual competition in the relevant market).  For example, as stated in

9  the declaration of Layn Barry, the Controller of Mahard Egg Farm, which has multiple egg

10  production farms in North Texas and Southern Oklahoma: "The egg production industry is highly

11  competitive and tightly controlled by others. . . . "   Barry Decl. ¶ 7.  Further, Chad Gregory, the

12  President of the United Egg Producers, which is a cooperative of United States chicken egg farmers,

13  stated: "Customers typically will replace an egg producer to save pennies per dozen eggs. . . ."

14  Gregory Decl. ¶ 9.  Plaintiff's expert acknowledges the "extremely competitive nature of the egg

15  industry."  Gay Decl. ¶ 14.

16  **2.      Public disclosure of the entirety of the redacted information would likely cause**
   **substantial competitive harm by allow underbidding by competitive egg producers, but**
17  **disclosure of one limited portion would not.**

18         Defendant argues that disclosure of the redacted information is likely to cause substantial

19  competitive harm because the competitors of the egg producers at issue can use the redacted

20  information to form an accurate estimate of each farm's or producer's rate of egg production and use

21  the estimate to lure customers away.  See GC Micro Corp., 33 F.3d at 1115 (information may result

22  in substantial competitive harm if it "would allow competitors to estimate and undercut, [a firm's]

23  bids.").  Plaintiff has acknowledged that the redacted information may be used to calculate an egg

24  farm's production capacity.  See Pl.'s Reply to Def.'s Opp. to Mot. for Disc. at 5 ("Plaintiff seeks

25  information that can be used to calculate egg farms' production capacity.").  Further, Plaintiff's

26  expert agrees that the redacted information may be used to estimate a farm's production capacity.

27  See Suderman Decl. ¶ 32 ("Dr. Ramirez notes correctly that total hen population, number of hen

28  houses, number of floors per house, number of cage rows per house, number of cage tiers per house,

and number of birds per cage may be used to estimate a farm's production capacity.").

Defendant's declarants testify that competitors can use accurate estimates of production capacity to underbid the egg producers at issue in this case and lure customers away.  For example, the Controller of Mahard Farms stated that: "The redacted information has significant commercial value to Mahard because it can be used to determine Mahard's egg production capacity and, if revealed publicly, Mahard's competitors could use the information to undercut Mahard's prices and lure away our customers."  Barry Decl. [Dkt 17-1] ¶ 6.  According to Barry, "a competitor of Mahard could use the redacted information to make an accurate estimate of the number of eggs Mahard's Chillicothe farm can produce, by multiplying the total hen population at Mahard's Chillicothe farm (which is in the redacted information) by the rate of egg production at its own farm."  Id.  Then:

> . . . if the competitor makes 100,000 eggs per day from a total hen population of 125,000 hens, the competitor can multiply the rate of .80 by Mahard's Chillicothe farm's total hen population and derive a fairly accurate estimate of our farm's production capacity.  A competitor can then adjust that production rate up or down according to its understanding of how efficiently our farm produces eggs.  Information about the structure of Mahard's hen houses, which is in the redacted information, including the number of hen houses, number of floors per house, number of cage rows per house, number of cage tiers per house and the number of birds per cage, also helps a competitor to determine the accuracy of its estimate of Mahard's production rate.  If the competitor's hen houses are structured in the same fashion as Mahard's, the competitor can be more certain that its estimate of Mahard's production rate is accurate.

Id.; see also Barry Decl [Dkt 17-1] ¶ 8 ("If Mahard's competitors were to obtain the redacted information, they could use the information to undercut Mahard's egg price, and egg customers are likely to take the lower price, even if Mahard has been their major supplier for years.  The reason is that price is the paramount concern in this industry."); ¶ 9 ("Once an egg producer loses deals with customers, it is difficult to regain those customers.  The best way to attract customers is to sell at a loss, but in the egg industry, it is hard to sell at a loss for any extended period of time because the profit margins are so small."); Gregory Decl. [Dkt. 17-2] ¶ 9 ("Public disclosure of the redacted information could devastate the competitive position of the egg producer whose information was disclosed because competitors could use the information to determine the number of eggs the producer can produce in a day and the offer to make the same or greater number of eggs for a

8

**United States District Court**
For the Northern District of California

1   cheaper price, causing the producer to lose money. . . . Customers typically will replace an egg

2   producer to save pennies per dozen eggs: that is how competitive the market is."); Storm Decl. [Dkt.

3   33-5] ¶ 17 ("The FDA's release of this compilation of information for each Cal-Maine facility would

4   give Cal-Maine's competitors information they do not have and could therefore cause substantial

5   competitive harm to Cal-Maine and the egg industry as a whole."); Ramirez Decl. ¶ 23 ("Once a

6   competitor knows the production rate at an egg farm [which can be derived from the redacted

7   information], that competitor can enter the farm's regional market and offer to produce the same

8   number of eggs per day for a lower price or a greater number of eggs per day for the same price and

9   thereby lure away the farm's customers.").  Based on this evidence, Defendant argues that because

10  public release of the redacted information would enable competitors to underbid the egg producers

11  whose information Plaintiff seeks and take away their customers, the release of the information

12  would substantially injure the competitive positions of the egg producers at issue in this case.

13       Plaintiff responds that Defendant has failed to show that knowledge of a farm's egg

14  production capacity would enable a competitor to underbid it, relying on <u>GC Micro Corp. v. Defense</u>

15  <u>Logistics Agency</u>, 33 F.3d 1109, 1112 (9th Cir. 1994).  There, the Ninth Circuit found that there was

16  no substantial competitive harm because:

17          . . . data on the percentage and dollar amount of work subcontracted out to SDB's on
            each defense contract tells competitors nothing of, inter alia, the object of the contract
18          or subcontracts, the unit prices charged by the subcontractors, and the profit or
            productivity rates of either the contractor or subcontractors. The data at issue
19          therefore would provide little if any help to competitors attempting to estimate and
            undercut the contractors' bids.

20

21  <u>Id.</u>  In particular, Plaintiff's expert opines that one would need to know cost and profit information

22  to estimate a competitor's bid.  <u>See</u> Gay Decl. ¶¶ 18-22-23.  Plaintiff also argues that one would

23  need to know an egg producer's reliability.  <u>See</u> Suderman Decl. ¶ 38 ("[A] purchasing agent will

24  tolerate a slight increase in price in order to retain a reliable supply chain.").  In addition, Plaintiff

25  contends that the knowledge of egg production is meaningless unless a competitor knows how many

26  of those eggs are already being sold to other customers and how many are available to be offered in

27  a bid, and that information is not in the redacted information.  In short, Plaintiff argues that there are

28  too many other variables for a competitor to undercut a bid by obtaining the redacted information

1   alone.

2          Plaintiff, however, ignores the fact that competitors can acquire or accurately estimate other

3   pieces of information to combine with the totality of the redacted information to cause competitive

4   harm.  For example, publicly available manuals, which are produced by the suppliers of hen breeds

5   used by the majority of egg producers, can provide or accurately estimate information such as the

6   lifespan of the hens and the number of eggs laid per chicken per year.  Ramirez Decl. ¶ 20 (such

7   manuals provide data regarding the birds' expected rate of egg lay according to bird age, which can

8   be analyzed to derive an average rate of egg lay).  Further, competitor egg producers can use the

9   redacted information to estimate or acquire information about feeding technology and equipment

10  used in production based on the competitor's own technology and equipment and the Urner-Barry

11  commodity news price quote.  Barry Decl. ¶ 7.  Therefore, release of all of the redacted information

12  is likely to cause substantial competitive harm.  See Braintree Elet. Light Dep't v. Dep't of Energy,

13  494 F. Supp. 287, 290 (D. D.C. 1980) ("release of separate pieces of [the] financial puzzle would

14  enable competitors, who may somehow have gathered other pieces, to complete the picture" and

15  cause competitive harm).  While Plaintiff is correct that other information beyond the redacted

16  information is needed to undercut competitors, Defendant has shown that such other information can

17  be estimated from other publicly available sources, so competitors could obtain the information that

18  Plaintiff's expert says is needed to combine with the redacted information.  The standard, of course,

19  is only a likelihood of substantial competitive harm, not a certainty.  However, as described below,

20  Defendant has not shown that disclosure of a very limited portion of the redacted information -- the

21  number of birds per cage -- would likely cause substantial competitive harm.

22          Plaintiff also argues that competitors cannot underbid the egg producers at issue in this case

23  because egg producers are generally unable to affect the price of eggs.  See Pl.'s Cross-Mot./Opp. at

24  13.  Defendant's declarant states that: "Egg production costs, including the costs of hen feed,

25  replacement pullets (hens who have not yet laid an egg), labor, housing and equipment, are largely

26  out of egg producers' control."  Ramirez Decl. ¶ 17.  Although this presents a close question,

27  Defendant's declarants have testified to the particular nature of the egg industry (as opposed, for

28  example, to the defense contracts at issue in GC Micro), and have pointed out that individual egg

United States District Court
For the Northern District of California

1  producers can lure away customers from other egg producers by selling eggs to a particular customer

2  at a price below the cost of production for a limited time.  See, e.g., Barry Decl. [Dkt 17-1] ¶¶ 7-9

3  ("What Mahard can influence . . . are its deals with customers. . . . If Mahard's competitors were to

4  obtain the redacted information, they could use the information to undercut Mahard's egg price, and

5  egg customers are likely to take the lower price, even if Mahard has been their supplier for years. . .

6  The best way to attract customers is to sell at a loss. . . ."); Ramirez Decl. ¶¶ 15-17, 23 (stating that

7  egg producers can sell at a loss at some points during the year and describing how underbidding can

8  occur).

9      Plaintiff argued that this case is like Fox News Network, LLC v. United States Department of

10  the Treasury, 739 F. Supp. 2d 515 (S.D. N.Y. 2010), where the plaintiff sought records from the

11  defendant under FOIA related to the intervention of the federal government in 2008 to prevent the

12  impending financial collapse of American Insurance Group and Citigroup, Inc.  The government

13  withheld information related to the operations, structure, and capacities of banks and financial

14  institutions under exemption 4.  The Fox News court found little competitive harm in disclosure of

15  documents relating to employee compensation potential.  The bank had made an argument somewhat

16  similar to Defendant's undercutting argument here:

17      The argument for the confidentiality of the actual compensation data apparently is
       that competitors who know exact compensation information would be able to poach
18      AIG's employees by offering them higher salaries. AIG further contends that the
       negotiation information may 'provide competitors with ammunition in their poaching
19      efforts by allowing them to suggest what new restrictions may be coming in the
       future, even if the speculation is entirely inaccurate.'

20

21  Fox News, 739 F. Supp. 2d at 567.  The court rejected this argument:

22      Although Mr. Kourides contends that even inaccurate speculation about new
       compensation restrictions that had been proposed might harm AIG, this argument is
23      entirely speculative. Neither Treasury nor AIG has explained how inaccurate (or even
       accurate) information would materially help competitors to poach employees.
24      Perhaps AIG believes its competitors will scare its employees into jumping ship by
       speculating about future compensation restrictions. In the alternative, AIG may be
25      concerned that its employees will flee to competitors after learning of draconian
       executive compensation provisions that had been proposed, but were not actually
26      adopted. Treasury and AIG simply have not explained, however, how the release of
       the redacted information contained in these documents would likely result in the loss
27      of key employees to AIG's competitors at this late date.

28  Id. at 567-68.  Plaintiff argued that similarly here, even without the redacted information, an egg

    producer could simply contact Safeway or any other retailer to find out their egg needs, and then

**United States District Court**
For the Northern District of California

1   undercut that price, similar to contacting employees directly as argued in <u>Fox News</u>.  <u>Fox News</u>, 739

2   F. Supp. 2d at 567 ("Fox contends that Treasury's arguments are meritless because a competitor

3   wishing to outbid AIG for an employee can simply contact the employee, determine how much they

4   earn, and extend an offer of more money.").  Plaintiff's argument here, however, is speculative.  For

5   example, it provided no evidence that Safeway or any other retailer would simply divulge its

6   purchasing needs or make purchasing decisions in response to a single telephone call (as opposed to

7   an employee contacted by a recruiter or prospective employer).  Further, there is evidence that

8   knowing all of the redacted information could also enable competitors to make improvements to

9   their operations, allowing them to undercut prices.  <u>See</u> Kaelin Decl. ¶ 13.

10      Plaintiff also argues that the redacted information is not necessary to offer customers a better

11  deal because the egg market is "highly competitive" (<u>see</u> Gay Decl. ¶ 19), and competitive markets

12  have low barriers to entry so that any competitor can enter the market to increase profits and

13  decrease a competitor's market share.  Gay Decl. ¶ 19.  However, the test for competitive harm is

14  not whether the information is necessary, but whether release of the information is likely to cause

15  substantial competitive harm.  <u>See</u> <u>McDonnell Douglas Corp. v. U.S. Dep't of the Air Force</u>, 375

16  F.3d 1182, 1187 (D.C. Cir. 2004) ("<u>National Parks I</u>, of course, does not require the party invoking

17  Exemption 4 to prove disclosure certainly would cause it substantial competitive harm, but only that

18  disclosure would 'likely' do so.").

19      Further, despite Plaintiff's argument to the contrary, <u>GC Micro</u> is not particularly apposite.

20  In <u>GC Micro</u>, there was not enough information at issue to undercut a bid, but here the declarants

21  have shown a likelihood that disclosure of all of the withheld information would allow competitors

22  to lure customers away.  Moreover, <u>G.C. Micro</u> addressed the non-market process of awarding long

23  term, sealed-bid government contracts.  <u>See, e.g.</u>, <u>GC Micro</u>, 33 F.3d at 1113-14.

24      More on point is <u>Lion Raisins, Inc. v. United States Department of Agriculture</u>, 354 F.3d

25  1072 (9th Cir. 2004).  The plaintiff there, an independent handler of raisins, brought a FOIA action

26  seeking documents withheld in part under exemption 4 regarding the USDA inspections at Lion's

27  facility and its competitors' facilities, as well as internal reports of the criminal investigation of

28  Lion.  The district court granted summary judgment in favor of USDA, which was affirmed in part.

United States District Court
For the Northern District of California

1   Lion Raisins addressed whether releasing Line Check Sheets (results of samples taken during

2   inspections from handler's processing lines) would cause competitive harm in the highly competitive

3   raisin industry.  Lion Raisins, 354 F.3d at 1076.  The plaintiff argued that as in GC Micro,

4   production of the Line Check Sheets would not allow it to infer confidential information about its

5   competitors because other significant variables (e.g., name of producer, buyer's name, etc.) would

6   still be redacted.  The USDA countered that revealing even the limited information Lion sought

7   would allow Lion to infer critical information about its competitors' volume, market share, and

8   marketing strategy.  The Ninth Circuit distinguished Lion Raisins from GC Micro where the subject

9   matter of the government contracts was obscured, because the Line Check Sheets identified the

10  exact type of raisin sold.  The court also stated that revealing the "sampling time" information would

11  allow Lion to infer the volume of its competitors' raisin sales because raisin packers work longer

12  hours when they have a high volume of business, and with knowledge of the hours worked, Lion

13  could deduce whether its competitors were producing a high volume.  Also, the Line Check Sheets

14  contained remarks, such as container size and Inspection Certificate number, from which Lion could

15  infer the identity of the packer.  Therefore, the court found that the plaintiff could use the withheld

16  information to cut its prices for the types of raisins its competitors packed to undercut them.

17  Similarly, here, there is evidence that the egg industry, like the raisin industry, is highly competitive,

18  and the totality of the redacted information would allow others to infer important competitive

19  information.

20         Plaintiff also argues that Defendant has not shown that the redacted information should be

21  withheld because competitors can already estimate egg production capacity without it.  See, e.g.,

22  Jurewicz v. United States Dep't of Agriculture, 891 F. Supp. 2d 147, 154 (D. D.C. 2012) (affirming

23  an agency's decision that information was not confidential under Exemption 4 in part because

24  publicly disclosed information already gave competitors some sense of the dog pricing operation at

25  issue); Greenberg v. FDA, 803 F.2d 1213, 1217-18 (D.C. Cir. 1986) ("Similarly here, where the cost

26  and availability of the information from alternative sources is contested, summary judgment is

27  inappropriate.").  For example, Plaintiff points out that egg producers have publicly stated their total

28  hen populations on occasion at certain facilities.  See, e.g., Cromwell Decl. Ex. F (newspaper article

1  on Cal-Maine's Waelder facility stating that when the new facility is completed, it will produce 44

2  million dozen eggs annually); Ex. H (article stating that each Pilgrim's Pride facility acquired by

3  Cal-Maine holds about 1.4 million laying hens); Ex. K (consent decree in unrelated case stating that

4  Mahard's Vernon-Chillicothe facility has sixteen barns, housing approximately 1.7 million laying

5  hens).  Plaintiff also notes that some egg producers with multiple facilities have disclosed total hen

6  populations.  See, e.g., Cromwell Decl. Ex. I (Cal-Maine document reporting that in 2011, it had

7  33.5 million total hens (pullets and breeders)); Ex. V (2012 Annual Report from Cal-Maine

8  disclosing total flock of 32.8 million hens).  Plaintiff also notes that information about annual

9  production for the farms generally is publicly available.  See, e.g., Cromwell Decl. Ex. I (Cal-Maine

10  document stating that Cal-Maine sold 821.4 million dozen eggs for the fiscal year ending 2011); Ex.

11  V (Cal-Maine annual report stating that Cal-Maine sold approximately 884.3 million dozen eggs in

12  fiscal year 2012).

13       In addition, Plaintiff's expert states that producers can already estimate competitors'

14  production capacities.  Suderman Decl. ¶¶ 23-31.  However, the Suderman declaration is conclusory

15  and based largely on other industries.  Suderman Decl. ¶¶ 27-28 ("competitors in like industries are

16  prolific at quantifying their competitors' business information on their own." ).  Suderman relies on

17  the AGRISTAT database company whose mission it is to facilitate sharing of information, and

18  speculates that the information is probably shared because "virtually everyone in the industry can

19  connect the information supplied in AGRISTAT with the individual company who supplied the

20  data." Suderman Decl. ¶¶ 30-31.  Suderman does not state that the egg production information was

21  even given to AGRISTAT, but he simply opines in a conclusory manner without supporting facts

22  that UEP must have shared the information, which UEP President Gregory denies.

23       Defendant has shown that release of the entirety of the redacted information would support

24  underbidding or undercutting that would be likely to cause substantial competitive harm.  However,

25  at the hearing, the Court raised the issue of whether a limited portion of the redacted information

26  could be released without causing substantial competitive harm.  For example, the Court noted that

27  releasing the number of birds per cage alone would not appear to threaten any competitive harm.

28  Defendant did not raise any persuasive argument to support withholding that limited portion of the

redacted information, and no one has suggested how that information would allow an accurate estimate of total egg production or reveal enough about how to improve production to likely harm competition at all, much less substantially.  Therefore, although most of the information was properly withheld under Exemption 4, the Court finds that public disclosure of the number of birds per cage would not likely cause substantial competitive harm.

**Conclusion**

Defendant has shown that there is actual competition in the relevant market, and a likelihood of substantial competitive injury if the entirety of the redacted information were released.  However, its redaction of the number of birds per cage by itself would not likely cause substantial competitive harm and is therefore not properly within exemption 4.

**IT IS SO ORDERED.**

Dated: August 22, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge

**United States District Court**
For the Northern District of California

15