UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOOD & DRUG ADMINISTRATION,<br><br>Defendant. | Case No. 12-cv-04376-KAW<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 195, 199 |

Plaintiff Animal Legal Defense Fund filed the instant suit against Defendant United States Food and Drug Administration, seeking production of records under the Freedom of Information Act ("FOIA"). (Compl. ¶ 1, Dkt. No. 1.) Pending before the Court are the parties' cross-motions for summary judgment. (Def.'s Mot., Dkt. No. 195; Pl.'s Cross-Mot., Dkt. No. 199.)

Having considered the parties' filings, the relevant legal authorities, and the arguments made at the July 15, 2021 hearing, the Court DENIES Defendant's motion for summary judgment and GRANTS Plaintiff's cross-motion for summary judgment.

## I.   BACKGROUND

### A.   FOIA Request

Defendant inspects egg production establishments to protect the public from adulterated food. (Joint Findings of Fact ¶ 6, Dkt. No. 122.) Defendant's investigators memorialize inspectional findings in narrative reports called Establishment Inspection Reports ("EIRs"). (Joint Findings of Fact ¶ 7.)

On December 15, 2011, Plaintiff submitted a FOIA request for documents relating to egg safety and production in Texas. (Joint Findings of Fact ¶ 8.) Defendant produced responsive documents, including: (1) seven EIRs related to facilities owned and operated by Cal-Maine

1  Foods, Inc. ("Cal-Maine"), (2) two EIRS related to facilities owned and operated by Feather Crest
2  Farms, Inc. ("Feather Crest"), (3) one EIR for a facility owned and operated by Mahard Egg Farm,
3  Inc. ("Mahard"), and (4) one EIR for a facility owned and operated by Pilgrim's Pride
4  Commercial Layer ("Pilgrim's Pride").[1]  (Joint Findings of Fact ¶ 9.)  Defendant, citing
5  Exemption 4 of FOIA, redacted the following categories of information (along with other
6  categories of information not at issue in this case): (1) total hen population, (2) number of hen
7  houses, (3) number of floors per house, (4) number of cage rows per house, (5) number of cage
8  tiers per house, and (6) number of birds per cage.  (Joint Findings of Fact ¶ 12.)

### B. Procedural History

On August 20, 2012, Plaintiff filed the instant suit, seeking production of the EIRs without the disputed redactions.  (Compl. ¶ 1; Joint Findings of Fact ¶ 13.)  On August 22, 2013, Judge Laporte ordered the release of the number of birds per cage following cross-motions for summary judgment.  (Dkt. No. 52 at 15.)  As to the remaining categories, Judge Laporte found there was "a likelihood of substantial competitive injury" if the information was released.  (*Id.*)  On April 4, 2016, the Ninth Circuit found that there were genuine issues of material fact as to the potential competitive effect of releasing egg-production information and reversed and remanded for further proceedings.  (Dkt. No. 68 at 3.)

#### i. Trial Findings of Fact and Conclusions of Law

Following a four-day bench trial, Judge Laporte issued findings of fact and conclusions of law on January 23, 2019.  (Trial Order, Dkt. No. 169.)  Judge Laporte found that the shell egg (eggs that are still in their shells) market was highly competitive, and that egg producers consider all egg producers in the United States, regardless of location, to be potential competitors.  (*Id.* at 5.)  Contracts are negotiated between egg producers and buyers, and prices are typically based on egg prices published by Urner Barry, an organization that surveys egg producers and retailers to quote a daily regional price that reflects the generally prevailing price in that market.  (*Id.*)

---

[1] EIRs for facilities owned and operated by Kieke Egg Farm ("Kieke") and Ruby's Quail Farm are no longer at issue.  (*See* Joint Findings of Fact ¶ 9 (stating EIRs for Ruby's Quail Farm are no longer at issue); Second Supp. Kaelin Decl. ¶¶ 11-12 (stating that Kieke authorized release of the information); Pl.'s Cross-Mot. at 7 (acknowledging release of Kieke EIR).)

United States District Court
Northern District of California

At trial, industry witnesses testified that the redacted information could be used to estimate an egg producer's production capacity and costs, which are important factors in a producer's development of a bid to potential customers. (Trial Order at 6.) For example, such information could be used to convince a customer that a company was better able to fulfill the customer's needs, to underbid another producer using the improved understanding of its production costs, to highlight ways that a producer's facilities were better, and to inform decision-making on long-term expansion. (*Id.* at 6-7.) The industry witnesses, however, testified that they were not aware of any instance where a competitor used the redacted information to its competitive advantage. (*Id.* at 7.) Further, Judge Laporte found that the redacted information only provided an incomplete picture of production capacity and costs, and that a competitor would need other information about a producer's breed of hen, mortality rate, hen house lighting, and feed and water source and consumption. (*Id.* at 7-8.) Several witnesses testified that feed is a producer's largest single cost factor, making up more than half of a producer's total costs. (*Id.* at 8.) Further, the industry witnesses could not offer any basis upon which a competitor might be able to estimate another producer's feed costs. (*Id.*) Industry witnesses also testified that the structure of hen houses (*i.e.*, number of floors, rows, and tiers) was a factor in producer's costs, but were unable to explain how a competitor might use that information to determine another producer's costs. (*Id.* at 9-10.)

With respect to public disclosure, Judge Laporte found that egg producers generally do not publicly disclose the categories of information at issue. (Trial Order at 10.) They consider the information to be confidential and proprietary, and do not release the information over concerns that disclosure of the information will give a competitor a sense of production costs and capacity. (*Id.*) To safeguard this information, producers restrict access to their farms by prohibiting competitors and the public from entering. (*Id.*) While Plaintiff provided examples of the disclosure of the categories of information at issue, such examples were sporadic, for a limited number of facilities, for a limited subset of the redacted categories, were from years other than 2011 (the year of the EIRs at issue), or provided information not sufficiently similar to or as detailed as that in the EIRs. (*Id.* at 11.) Plaintiff also presented evidence that the egg producers did not take every step available to keep information confidential (*e.g.*, employees did not sign

3

1   non-disclosure agreements), although Judge Laporte found that there was no requirement that the
2   producers take every conceivable step to keep information confidential. (*Id.* at 18.) Thus, Judge
3   Laporte found that except for number of hen houses, Plaintiff had not demonstrated that the egg
4   producers had publicly disclosed the other categories of information, such that the information is
5   no longer confidential and Exemption 4 would not apply. (*Id.* at 18-19.)

6   Judge Laporte ultimately concluded that Exemption 4 applied to the total number of hens,
7   as disclosure of total hen population gives a competitor the most direct insight into the total
8   number of eggs that a farm could produce in the short run. (Trial Order at 15.) As to the total
9   number of hen houses and hen house structure, however, Judge Laporte found Defendant had not
10  shown that disclosure of these categories presents a likelihood of substantial competitive harm.
11  (*Id.* at 16.) While disclosing such information gave a competitor some general indication of an
12  egg producer's capacity and costs, it was not sufficiently precise or reliable because there was no
13  guarantee that a hen house is being used at full capacity. (*Id.*) Further, other variables affected
14  capacity and costs, including, most importantly, the cost of feed. (*Id.*) Thus, there was no
15  persuasive evidence that such information, if disclosed, had any meaningful ability to give a
16  competitive edge to one egg producer over another. (*Id.* at 17.) Accordingly, Judge Laporte
17  ordered the disclosure of the number of hen houses, number of floors per hen house, number of
18  cage rows per hen house, and number of cage tiers per hen house. (*Id.* at 20.)

19  **ii.    Post-Trial Developments**

20  Defendant[2] timely appealed; while on appeal, the Supreme Court issued its ruling in *Food*
21  *Marketing Institute v. Argus Leader Media* ("*Argus Leader*"), 139 S. Ct. 2356 (2019). There, the
22  Supreme Court rejected the requirement that disclosure would cause "substantial competitive
23  harm" to the person from whom the information was obtained, which was the standard applied by
24  Judge Laporte at trial. *Argus Leader*, 139 S. Ct. at 2364. Instead, the Supreme Court found that
25  "where commercial or financial information is both customarily and actually treated as private by
26  its owner and provided to the government under an assurance of privacy, the information is

---

[2] Plaintiff originally cross-appealed on the issue of total hen population, but subsequently dropped that appeal. (Pl.'s Cross-Mot. at 6 n.7.) Thus, total hen population is no longer at issue. (*Id.*)

'confidential' within the meaning of Exemption 4." *Id.* at 2366.

On January 16, 2020, the Ninth Circuit remanded the case with instructions to apply *Argus Leader*, stating:

> We find remand particularly appropriate here because the record is underdeveloped as to whether each egg producer customarily and actually kept each category of information at issue confidential. For example, although representatives from Feather Crest, Cal-Maine, and Mahard Farms testified that they would not let the public see the information that is subject to FDA inspection, there is insufficient evidence as to what specific steps each producer took to keep its information confidential. Moreover, it appears that some (but not necessarily all) producers voluntarily publically disclosed certain category of information in ways that undermine confidentiality.

*Animal Legal Defense Fund v. U.S. FDA* ("*ALDF*"), 790 Fed. Appx. 134, 135-36 (9th Cir. 2020). Accordingly, the Court was to "determine whether one or more egg producers 'customarily and actually treated' the relevant information 'as private.'" *Id.* at 136.

On November 16, 2020, the case was assigned to the undersigned. (Dkt. No. 186.) On February 25, 2021, Defendant filed its motion for summary judgment. Defendant stated that it had released the number of hen houses in the EIRs, such that the only information at issue was the number of floors, rows, and tiers per hen house for the EIRs of Feather Crest, Cal-Maine, Pilgrim's Pride, and Mahard ("Hen Housing Information"). (Def.'s Mot. at 8; Kaelin Second Supp. Decl. ¶¶ 9-10, Dkt. No. 195-2; *see also* Pl.'s Cross-Mot. at 7.) On April 1, 2021, Plaintiff filed its cross-motion for summary judgment. On April 15, 2021, Defendant filed its opposition to Plaintiff's cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 201.) On May 6, 2021, Plaintiff filed its reply. (Pl.'s Reply, Dkt. No. 207.)

## II.   LEGAL STANDARD

### A.   The Freedom of Information Act ("FOIA")

"Congress enacted FOIA to overhaul the public-disclosure section of the Administrative Procedure Act (APA). . . ." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). The intent behind the FOIA was to "clos[e] the loopholes which allow agencies to deny legitimate information to the public." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989) (citations and quotations omitted). Its purpose was to "ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, (1989) (citations and quotations omitted). Accordingly, FOIA mandates a "strong presumption in favor of disclosure," with "disclosure, not secrecy, [being its] . . . dominant objective . . . ." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

"At the same time, the FOIA contemplates that some information can legitimately be kept from the public through the invocation of nine 'exemptions' to disclosure." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 687 (9th Cir. 2012) (citing 5 U.S.C. § 552(b)(1)-(9)); *see also Tax Analysts*, 492 U.S. at 150-51 (agency must disclose records unless the records may be withheld pursuant to one of the enumerated exemptions listed in § 552(b)); *Lion Raisins, Inc. v. U.S. Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (FOIA requires full agency disclosure except where specifically exempted). Because FOIA has a strong presumption in favor of disclosure, "the burden [is] on the government to show that an exemption properly applies to the records it seeks to withhold." *Hamdan v. United States Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015). Moreover, the courts "do not give deference" to the agency's determination of whether an exemption applies. *See Carlson v. USPS*, 504 F.3d 1123, 1127 (9th Cir. 2007).

### B. Motion for Summary Judgment

Summary judgment is the proper avenue for resolving a FOIA case. *See, e.g., Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114, 1115 (9th Cir. 1988). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To prevail on a motion for summary judgment in a FOIA case, an agency must demonstrate that, drawing all reasonable inferences in the light most favorable to the requester, there is no genuine issue of material fact with regard to the agency's compliance with FOIA, both in terms of conducting a search reasonably calculated to uncover all relevant documents and withholding only those documents or pieces of information that fall within one of the specified exemptions. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009); *Kamman v. IRS*, 56 F.3d 46, 49 (9th Cir. 1995); *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

### III. DISCUSSION

At issue is whether Exemption 4 applies in the instant case. "Exemption 4 . . . shields from disclosure 'trade secrets and commercial or financial information obtained from a person and privileged or confidential.'" *Argus Leader*, 139 S. Ct. at 2361 (quoting 5 U.S.C. § 552(b)(4)). The parties dispute whether the Hen Housing Information is "confidential." (*See* Def.'s Mot. at 12; Pl.'s Cross-Mot. at 9. The term "confidential" must be given its' "ordinary, contemporary, common meaning," which is "private" or "secret." *Argus Leader*, 139 S. Ct. at 2362-63. "[I]nformation communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* at 2363. In other words, the information must be "both customarily and actually treated as private by its owner . . . ." *Id.* at 2366. As applied in *Argus Leader*, the Supreme Court found that store-level SNAP data was confidential because uncontested testimony established that retailers customarily did not disclose such information or make it publicly available in any way, and that even within the company, "only small groups of employees usually have access to it." *Id.* at 2363.

The Supreme Court also observed that "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Argus Leader*, 139 S. Ct. at 2363. The Supreme Court, however, left as an open question whether privately held information could "*lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." *Id.*

Having reviewed the evidence in the record, the Court concludes that Defendant has not satisfied its burden of showing that the Hen Housing Information was customarily and *actually* treated as private by the egg producers. *See ALDF*, 790 Fed. Appx. at 136.

As an initial matter, there is no evidence in the record as to the specific steps taken by Pilgrim's Pride to keep the Hen Housing Information confidential. While Cal-Maine acquired Pilgrim's Pride in July 2012, Cal-Maine does not describe what steps, if any, were taken by Pilgrim's Pride *prior* to the acquisition.

At the hearing, Defendant urged the Court to consider the Cal-Maine information as applying to Pilgrim's Pride because Cal-Maine argued on behalf of both during the trial. As

1  Plaintiff points out, however, the trial court was considering the distinct question of whether
2  disclosure would result in competitive harm. Here, as directed by the Ninth Circuit, the Court
3  must consider the "specific steps *each producer* took to keep its information confidential." *ALDF*,
4  790 Fed. Appx. at 136 (emphasis added). Thus, the Court must base its analysis on the specific
5  steps Pilgrim's Pride took to keep the Hen Housing Information confidential. Information about
6  Cal-Maine's procedures cannot substitute for this inquiry; if Pilgrim's Pride took no steps to keep
7  the Hen Housing Information confidential, then the Hen Housing Information would not have
8  *actually* been treated as private even if Cal-Maine applied its procedures to Pilgrim's Pride after
9  the acquisition.

10  In the alternative, Defendant points to the December 20, 2012 declaration of Craig Raysor,
11  the Associate General Counsel for Pilgrim's Pride. (Raysor Decl., Dkt. No. 17-5.) Mr. Raysor's
12  declaration, however, is limited to how the Hen Housing Information was used during the
13  acquisition of Pilgrim's Pride by Cal-Maine. Specifically, Mr. Raysor explained that "[p]rivate
14  parties entering into such acquisitions will typically sign a letter of intent with confidentiality
15  provisions, or separate non-disclosure agreements to protect the integrity of the transaction, and
16  many of these transactions would never commence let alone consummate without such
17  confidentiality." (Raysor Decl. ¶ 7.) Mr. Raysor, however, does not describe any steps taken to
18  keep the Hen Housing Information private outside of acquisitions; Mr. Raysor does not even state
19  that the public is prohibited from entering the hen houses. Absent such information, the Court
20  finds that the Hen Housing Information as to Pilgrim's Pride must be produced given the absence
21  of information as to the specific steps Pilgrim's Pride took to keep this information confidential.
22  *See ALDF*, 790 Fed. Appx. at 136.

23  Similarly, the Court finds that the declaration of Robert L. Krouse to not be germane. Mr.
24  Krouse is the Chief Executive Officer of MPS Egg Farms ("MPS"), which acquired Feather Crest
25  in 2020. (Krouse Decl. ¶¶ 1, 6, Dkt. No. 195-3.) Mr. Krouse discusses how MPS protects the Hen
26  Housing Information but does not explain what steps were taken by Feather Crest back in 2011,
27  nine years before the acquisition. Thus, this declaration is not probative as to what steps Feather
28  Crest actually took to keep the Hen Housing Information private.

1  Defendant asserts that the egg producers keep the Hen Housing Information private by not making their facilities open to the public. For example, Cal-Maine's facilities are gated, the doors are kept locked, and visitors are subject to security procedures and protocols in accordance with FDA requirements and company policies. (Storm Decl. ¶ 8(a), Dkt. No. 17-7.)[3] Likewise, Feather Crest has locked gates, a biosecurity sign, and keypads. (Trial Tr. at 54:25-56:6, Dkt. No. 195-1.) Visitors to Feather Crest usually make arrangements to enter its premises ahead of time, and are escorted wherever they need to go. (Trial Tr. at 55:9-18.) Finally, Mahard also keeps its farm closed to the public. (Williams Dep. at 23:21-22, Dkt. No. 195-1.)

There appears, however, to be a dispute as to whether these actions are taken in order to keep the Hen Housing Information private, as opposed to biosecurity. Indeed, when asked why the farm is kept closed to the public, Mahard's representative repeatedly stated it was for biosecurity. (Williams Dep. at 23:23-24:6, 34:10-11.) With respect to records, Mahard's representative also stated that the records were not open to the public because Mahard was a family business, and thus it was not required to be open to the public. (Williams Dep. at 24:7-13.) Mahard's representative further stated that he was "not sure [the number of floors in the hen houses] would be a confidential type deal." (Williams Dep. at 45:1-6.) Feather Crest's representative likewise described the precautions as being part of its biosecurity program. (Trial Tr. at 54:23-25.) Thus, the Court finds there is a question of fact as to whether these security measures were done for the purpose of maintaining confidentiality, rather than for biosecurity purposes only.

Even assuming that the egg producers kept the farms closed to the public in order to keep the Hen Housing Information private, the evidence in the record shows that the egg producers did not actually prevent workers from disclosing the Hen Housing Information. For example, Defendant points to no steps taken by Mahard to keep its workers from disclosing the Hen

---

[3] Cal-Maine's representative also states that it restricts access to its computer systems to authorized users at various levels. (Storm Decl. ¶ 8(c).) As Plaintiff points out, however, "[t]his suit is[ no]t about computer files," but concerns "something anyone working at or visiting an egg facility could readily, visually observe . . . . restricting which employees can access computer files did nothing to stop every Cal-Maine employee at every 'level,' and every visiting service provider, from counting the rows, tiers, or floors in a hen house." (Pl.'s Reply at 10.)

Housing Information.  Instead, Mahard's representative acknowledged that it had interns who would leave and work for other egg producers, but that none of its employees signed nondisclosure agreements or noncompete agreements.  (Williams Tr. at 70:5-18, 71:1-16.)  Thus, there was nothing stopping workers from retaining the Hen Housing Information and disclosing it to subsequent employers or anyone else.  Feather Crest's representative stated that Feather Crest "brief[ed] its employees of the importance of keeping information confidential," but did not affirmatively state that such information included the Hen Housing Information.  (Trial Tr. at 57:19-20.)  Further, like Mahard, Feather Crest employees were not required to sign nondisclosure agreements, and that they were not otherwise "contractually bound to maintain confidentiality with respect to anything they learn[ed] about [its] operations while they[ were] working there." (Trial Tr. at 98:24-99:6.)  Feather Crest employees were also not required to sign noncompete agreements.  (Elbel Dep. at 67:17-19, Dkt. No. 199-1.)  Feather Crest's representative further acknowledged that it was possible for employees to take the Hen Housing Information to other egg producers.  (Trial Tr. at 99:10-13.)  Finally, while Cal-Maine's employees are required to "sign an agreement to maintain the confidentiality of all information regarding the company's operations, policies and procedures, and all other non-public information," Cal-Maine's representative likewise acknowledged that it was not a contract, and that employees did not sign nondisclosure or noncompete agreements.[4]  (Storm Dep. at 41:7-13, 118:14-23.)  Cal-Maine's representative also stated that he did not know of any egg producer in Texas that required non-disclosure agreements.  (Storm Dep. at 118:24-119:2.)

Likewise, and most significantly, the evidence in the record shows that egg producers did not prevent their suppliers or servicers from disclosing the Hen Housing Information.  There is no evidence that Cal-Maine or Mahard required suppliers and servicers to sign nondisclosure agreements or otherwise took steps to ensure that suppliers and servicers did not disclose the Hen Housing Information, which was readily observable by visitors to the hen houses.  Indeed, Feather

---

[4] The confidentiality agreement was not provided, so it is unclear what its terms are and what information it actually covers.  While Defendant argues that Plaintiff failed to raise that during Mr. Storm's testimony, it is ultimately Defendant's burden to demonstrate that "an exemption properly applies to the records it seeks to withhold." *Hamdan*, 797 F.3d at 772.

Crest's representative affirmatively testified that servicers were not required to sign nondisclosure agreements. (*See* Trial Tr. 99:14-22.) Feather Crest's representative also testified that egg producers "rely on the expertise of the suppliers of [cage] equipment, who are not only familiar with theirs but the *competitors*." (Trial Tr. 68:11-15 (emphasis added).)

At the hearing, Defendant asserted that there was no evidence that suppliers or servicers ever entered the farms. As noted above, however, Feather Crest's representative explained that suppliers of cage equipment are expected to be familiar with their customer's cage systems -- how cages are configured, how feed is conveyed, how the watering system works -- as well as the cage systems of their customer's competitors. (Trial Tr. 68:7-15.) It is unclear how those suppliers would have such knowledge without having entered the hen houses or assisted in set up. Feather Crest's representative also acknowledged having outside technicians, such as electricians, provide services on the farm. (Trial Tr. 99:14-22.) Feather Crest's representative further explained that such outside help would need to "be suited up properly and be escorted" to where they need to be working. (Trial Tr. 55:9-18.) As Plaintiff pointed out during the hearing, this presumes that such individuals were entering the hen houses, as suiting up was a necessary biosecurity measure if going near the hens. (*See* Elbel Dep. at 24:21-24, Dkt. No. 207-1 (explaining that when persons "go further onto the farm where they might be near our birds, then . . . they're suited up and provided boot covers and that sort of thing.").)

These facts stand in stark contrast to *Argus Leader*, where the SNAP data was "closely guard[ed]," was not disclosed or made publicly available "in any way," and there was limited access to the data even within the company. 139 S. Ct. at 2361, 2363. Here, the Hen Housing Information could be viewed by every employee and supplier who visited the facilities. While some employees were required to sign confidentiality agreements or otherwise lectured about confidentiality, there was nothing legally preventing employees from disclosing the Hen Housing Information to competitors or any other individual. Indeed, it is not apparent to the Court that the confidentiality agreements required by Cal-Maine or discussions about confidentiality by Feather Crest actually included the Hen Housing Information, even though Defendant has the burden of demonstrating that the FOIA exemption applies. *See Hamdan*, 797 F.3d at 772. As for suppliers

and servicers, no suppliers or servicers were prevented from disclosing the Hen Housing Information to competitors. In fact, Feather Crest testified that they *relied* on the suppliers' knowledge, knowing that the suppliers were familiar with their competitors' cage equipment. In short, the Hen Housing Information could be -- and apparently was expected to be -- freely disseminated by employees and those who visited the facilities, including to competitors. Such broad disclosures undermine Defendant's assertions that the Hen Housing Information was being kept private or secret.[5] *Compare with Ctr. for Investigative Reporting v. Dep't of Labor*, Case No. 18-cv-2414-DMR, 2020 U.S. Dist. LEXIS 98329, at *11-12 (N.D. Cal. June 4, 2020) (finding no confidentiality where "the Form 300A information is both readily observable by and shared with employees, who have the right to make the information public"); *Ctr. for Investigative Reporting v. Dep't of Labor*, 470 F. Supp. 3d 1096, 1113 (N.D. Cal. 2020) ("finding documents confidential even if they are available to and broadly disclosed to all current and former employees of a large company without any confidentiality or nondisclosure agreements is untenable").

The Court also observes that the stated reasons for keeping the Hen Housing Information private appear suspect. Specifically, Defendant asserts that the egg producers are concerned that "disclosure of the Hen Housing Information would give a competitor a sense of a facility's costs and capacity," a significant factor in light of the extremely competitive shell egg market. (Def.'s Mot. at 13-14.) Judge Laporte, however, found that Defendant's witnesses could not explain how the Hen Housing Information could be used to determine another producer's costs. (Trial Order at 9-10.) Instead, Judge Laporte found that the Hen Housing Information did *not* provide information that was sufficiently precise or reliable, given that hen houses may not be used to full capacity and numerous other variables affecting capacity and costs, including the cost of feed. (*Id.* at 16-17.) Thus, Judge Laporte concluded that there was no persuasive evidence at trial that the

---

[5] While Defendant points to Judge Laporte's finding that egg producers generally do not publicly disclose the Hen Housing Information, public disclosure is a separate matter from whether information is actually treated as private and confidential. Information can conceivably not be publicly disclosed, but still not be private and confidential, such as -- to use Plaintiff's example -- the number of copy machines a law firm may have. (Pl.'s Cross-Mot. at 15 ("most law firms probably haven't had an occasion to publicly disclose the number of copy machines they have. But a law firm would neither customarily keep, nor actually treat, its number of copy machines as private.").)

Hen Housing Information, "if disclosed, have any meaningful ability to give a competitive edge to one egg producer over another, such as by enabling underbidding or permitting a producer to lure a customer away." (*Id.* at 17.) Ultimately, this appears to be a question of fact as to why an egg producer might or might not keep the Hen Housing Information private and confidential, but the Court need not decide the matter. Even if egg producers consider the Hen Housing Information confidential and proprietary, "the court must examine whether the information actually is kept and treated as confidential, not whether the submitter considers it to be so." *Ctr. for Investigative Reporting*, 2020 U.S. Dist. LEXIS 98329, at *10. Again, the undisputed facts show that workers and, in particular, suppliers and servicers were able to freely disclose the Hen Housing. Under those circumstances, the Court finds that Defendant has not met its burden of showing that the Hen Housing Information falls within Exemption 4.

Because the Court finds that Defendant has not established that the Hen Housing Information is customarily and actually kept private, the Court need not decide whether a government assurance of secrecy is required for Exemption 4 to apply.

### IV.    CONCLUSION

For the reasons stated above, the Court DENIES Defendant's motion for summary judgment and GRANTS Plaintiff's cross-motion for summary judgment. Defendant shall produce the EIRs without redactions to the Hen Housing Information within 30 days of the date of this order.

IT IS SO ORDERED.

Dated: July 30, 2021

KANDIS A. WESTMORE
United States Magistrate Judge